# Exhibit A



## CONTRACT PACKAGING AGREEMENT

**THIS CONTRACT PACKAGING AGREEMENT** ("**Agreement**") is entered into as of April 16th, 2024 (the "**Effective Date**"), by and between Hickory Farms, LLC, a Delaware limited liability company ("**Customer**"), and **South Atlantic Packaging Corporation, LLC** ("**Supplier**"). For purposes of this Agreement, Customer and Supplier may be referred to together as the "**Parties**" and individually as a "**Party**."

**WHEREAS**, Customer sells food gift tins filled with ready-to-eat food products as further specified on **Exhibit A** attached hereto and incorporated herein by reference (as such list may be amended by mutual written agreement of the Parties from time to time, "**Products**") to its customers;

**WHEREAS**, Supplier is engaged in the business of manufacturing, packaging and distributing a variety of products; and

**WHEREAS**, the Parties desire to enter into a written agreement whereby Supplier will package and sell to Customer the Products subject to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the good and valuable considerations hereinafter set forth and the mutual promises of the Parties, the Parties mutually agree as follows:

**Definitions:**

A. "**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether state, local, territory, province or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

B. "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award or determination entered by or with any Governmental Authority.

C. "**Intellectual PropertyRights**" means all industrial and other intellectual property rights comprising or relating to: (a) Patents; (b) Trademarks; (c) internet domain names, whether or not Trademarks, registered by any authorized private registrar or Governmental Authority, web addresses, web pages, website, and URLs; (d) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights and copyrightable works, software and firmware, data, data files, and databases and other specifications and documentation; (e) Trade Secrets; and (f) all industrial and other intellectual property rights, and all rights, interests and protections that are associated with, equivalent or similar to, or required for the exercise of, any of the foregoing, however arising, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights or forms of protection pursuant to the Laws of any jurisdiction throughout in any part of the world.

D. "**Law**" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Governmental Order or other requirement or rule of law of any Governmental Authority.

E. **"Patent"** means all patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents, and patent utility models).

F. **"Taxes"** means any and all present and future sales, income, stamp and other taxes, levies, imposts, duties, deductions, charges, fees or withholdings imposed, levied, withheld or assessed by any Governmental Authority, together with any interest or penalties imposed thereon.

G. **"Trademark"** means all rights in and to United States and foreign trademarks, service marks, trade dress, trade names, brand names, logos, symbols, trade dress, corporate names and domain names and other similar designations of source, sponsorship, association or origin, together with the goodwill symbolized by any of the foregoing, in each case whether registered or unregistered and including all registrations and applications for, and renewals or extensions of, such rights and all similar or equivalent rights or forms of protection in any part of the world.

H. **"Trade Secrets"** means all inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections, patent disclosures and other confidential and proprietary information and all rights therein.

1.      **Products and Specifications.** Customer shall purchase from Supplier the Products as further set forth on **Exhibit A** attached hereto and incorporated herein by reference, as reflected in purchase orders submitted from time to time in accordance with Section 7 of this Agreement. In connection with manufacturing and packaging the Products purchased hereunder, Supplier shall comply in all material respects with the specifications for such Products in use by Customer as of the date hereof (as such specifications may be amended by mutual written agreement of the Parties from time to time, the **"Specifications"**). Each particular Product may be processed and manufactured at (i) the specific Supplier facilities identified on **Exhibit B** (the **"Original Facilities"**), which Original Facilities shall be qualified as set forth on **Exhibit C** or (ii) any other Supplier facilities specified by Supplier (the **"Discretionary Facilities"**); provided, that in the case of clause (ii), (A) any Discretionary Facility must be qualified to at least the level of the prior Original Facility prior to any Products being produced at the Discretionary Facility and (B) the price for any Products being produced at a Discretionary Facility will remain FOB the Original Facility, and Supplier shall be responsible for all incremental costs (including freight) arising from the movement of Product manufacturing from an Original Facility to a Discretionary Facility. **[Notwithstanding the foregoing, for any Products produced by Supplier at one facility that are, at Customer's request, picked up by Customer's employees, agents, representatives or carriers at a different Supplier facility (collectively, "Resupply Products"), Supplier shall arrange and pass through to Customer the actual costs of all freight relating to the shipment of Resupply Products from the Supplier producing facility to the Supplier receiving facility.]**

2.      **Term.** The term of this Agreement shall end one year from Effective Date (the **"Initial Term"**), unless terminated sooner pursuant to the terms of this Agreement.

3.      **Materials.** Customer shall provide all Product inputs, including all ingredients and packaging materials used to manufacture or produce the Product (the **"Materials"**), to Supplier and such Materials shall be delivered FOB Supplier's **[Original Facility]** (each, a **"Material Shipment"**). Each Material Shipment shall include packaging slips, bills of lading and supplemental documents for Supplier to retain and use to inspect the Material Shipment for conforming Materials. Supplier shall inspect all Materials in the Material Shipment and shall note any visible damages and defects in the Materials before signing off on the Material Shipment. In addition, Supplier shall provide to Customer notification of any visible damages and defects (including providing pictures of the same) within 24 hours of receipt of a

2

Material Shipment or within 24 hours of discovering a latent defect that could not be discovered during the initial inspection. Supplier shall be responsible for visually inspecting and rejecting Materials. Customer shall retain title to and ownership of the Materials at all times. Supplier may not use Customer-purchased Materials for any customer other than Customer. Supplier shall inform Customer of any Materials in excess of six (6) weeks or any potential loss of Materials due to shelf life concerns within a commercially reasonable amount of time and use commercially reasonable efforts to prevent such loss. Supplier shall exercise reasonable care in handling, storing and protecting Materials intended for use in the Products.

4.     **Packaging Specifications of Supplier**.  Supplier shall comply with all of the product specifications, Customer's customer specifications and packaging obligations listed on **Exhibit D** attached hereto and incorporated herein by reference (collectively, the **"Specifications"**). Any Product Revision (as defined below) shall be subject to mutual written agreement of the Parties. Prior to any implementation of a Product Revision, the Parties shall mutually agree in writing on the details thereof, including, but not limited to, any appropriate price adjustments to reflect changes in costs due to such Product Revision. Once a Product Revision has been so mutually agreed upon in writing, Supplier will use commercially reasonable efforts to manufacture and package Products in conformance with such Product Revision within a reasonable period of time. A **"Product Revision"** shall mean any change to the Specifications and/or of a Product's formulation, pack size or configuration or package construction or design. Customer will pay for any obsolete packaging or ingredients resulting from a Product Revision or any changes to the label or artwork used on a Product.

5.     **Price**.  During the Term, the price of the Products shall be as listed on **Exhibit E** attached hereto and incorporated herein by reference. All prices are "all in" pricing to include, but not limited to, the assembly, storage, labeling, receiving of inbound materials, preparing outbound shipments and are exclusive of, and Customer shall be responsible for, all Taxes. In all events the pricing charged by Supplier to Customer will be as favorable as pricing Supplier charges to other of Supplier's customers for similar products.

6.     **Purchase Orders; Invoices and Payment.**

(a)     Orders.  All purchases of Products under this Agreement shall be pursuant to a duly authorized and issued Customer Purchase Order (**"Purchase Order"**) using the form attached hereto as **Exhibit F**. The terms and conditions of this Agreement shall apply to each Purchase Order of the Products submitted by Customer hereunder. Any terms or conditions appearing on the face or reverse side of any purchase order, acknowledgment, invoice or confirmation that are different from, or in addition to, those required hereunder shall not be binding on the Parties, even if signed and returned, unless both Parties expressly agree in a separate writing to be bound by such separate or additional terms and conditions.

(b)     Acceptance of Orders.  Upon receipt of a Purchase Order, Supplier shall send Customer notice of receipt of such Purchase Order (the "Acceptance Notice"), with such Acceptance Notice to indicate the date by when such Products and the amount of such Products shall be ready to be shipped, such date to be no later than three (3) days from the required shipping date listed on Customer's Purchase Order.

(c)     Invoices.  Supplier shall invoice Customer for the Products prepared for [**shipment**], and each invoice shall provide and indicate the Purchase Order number and the quantities [prepared to be shipped]. The Parties agree and acknowledge that payment terms shall be net thirty (30) days and shall be effective from the date of receipt of the invoice. Customer shall make all payments in US dollars [**via the Automated Clearing House**].

3

7. **Forecasts; Delivery; Warehousing.**

(a)     Forecasts. The Parties shall cooperate in good faith to develop rolling one (1) week (by Product and pack type), non-binding order forecasts of Customer's needs for the Products. The Parties shall use commercially reasonable efforts to provide such forecasts at least two (2) business days prior to the start of the applicable week.

(b)     Delivery; Risk of Loss. Unless Customer directs otherwise in writing, Supplier shall deliver to Customer each order of the Products **[FOB the Original Facility Dock Door]** no later than the shipment date provided in the applicable Acceptance Notice. At its sole cost, Customer or it's customer's sole costshall arrange for the pickup of the Products **[at the Original Facility Dock Door]**, at mutually convenient times. Supplier shall produce the Products and have the Products prepared for shipment by the dates specified in the applicable Acceptance Notice. In the event that a Purchase Order is not ready for delivery on the scheduled date on such Acceptance Notice, Supplier shall notify Customer immediately of the delay in order to permit Customer to attempt to mitigate the impact on its customers. Title and risk of loss shall pass to Customer immediately upon tender of possession to Customer, to any of Customer's employees, agents or representatives, or to any carriers arranged or approved by Customer when Supplier delivers the Products **[at the Original Facility Dock Door]**. If Supplier has produced Product in accordance with the applicable Purchase Order, and Customer does not take custody of the Product in a timely manner and such delay results in spoilage or an insufficient amount of code date of the Product, then Customer shall be responsible for the loss associated with such Product. If any spoilage or event resulting in an insufficient amount of code date of the Product is caused by the actions of Supplier, then Supplier shall bear all loss associated with such Product.

8.     **Reporting.** Supplier shall provide the required reporting listed in Exhibit G. Reporting will be delivered to Customer specific Sharepoint site, Supplier portal or other agreed upon method.

9.     **Returns; Recalls.**

(a)     Nonconforming Product. Any quality issues or Product defects or insufficient amounts of Products where such non-conformities originated before such Product left the custody and control of Supplier or are otherwise attributable to any act or omission of Supplier prior to such Product leaving Supplier's custody and control (collectively, the "**Nonconforming Product**") should be reported to Supplier in writing within ten (10) days of discovery. If timely notice is not received by Supplier, Customer shall be deemed to have accepted the Products without qualification; provided however if any federal, state or local agency, at any time, determines that any of the Products do not conform to the requirements of Law or regulation; or if any federal, state or local agency, at any time, identifies characteristics of the Products which do not conform to the Specifications or the requirements of this Agreement; and, if it is further determined that such non-conformity originated before the Product left the custody and control of Supplier or is otherwise attributable to any act or omission of Supplier, such determination shall be deemed a timely notification of Nonconforming Product. [If Customer timely notifies Supplier of any Nonconforming Product, Supplier shall, at Customer's reasonable discretion, replace such Nonconforming Product or refund the full price of such Nonconforming Product to Customer **[by providing a credit to Customer for the amounts paid for all Nonconforming Products as well as all costs of disposalor return on the next invoice(s) until the entire credit has been applied]**.

(b)     Recall. If either Party voluntarily elects to, or any government or regulatory agency requests or demands that either Party, or if any court orders either Party to withdraw, discontinue, remove or recall any Product, packaging or labeling (collectively, a "**Recall**"), because such Product, packaging or labeling, are adulterated, misbranded, defective, harmful or misleading in any way, it shall immediately notify the other Party by telephone and in writing. With respect to any Recall or potential Recall of a

4

Product, each Party agrees to provide to the other: (i) prompt and timely communication regarding any condition or event that does or may result in a Recall; and (ii) its reasonable cooperation. To the extent practicable, Supplier agrees to give to Customer advance notice of any Recall, to work with Cusotmer to coordinate such Recall and, consistent with Supplier's responsibilities, to use commercially reasonable effort minimize the impact of such recall on Customer and its customers. Regardless of which Party initiates the recall, Customer will have the sole right to manage customer relations and shall have the sole right to distribute any press release or other communications with respect to the recall. Supplier will not contact Customer's customers without Customer's prior written consent; rather Supplier will instruct any customer who contacts Supplier to contact Customer directly. Supplier shall bear all costs of any Recall, including without limitation the cost of the Products and Customer's lost sales as a result of such Recall, that arises as the result of any act, omission or default that occurs or fails to occur while the product is in Supplier's control, Customer shall bear all costs of any Recall that arises as the result of any act or omission of Customer, or any third party, which are not the direct result of any act or omission caused by Supplier..

(c) Survival. The provisions of this Section 8 shall survive the expiration or early termination of this Agreement.

10. **Right to Audit.** From time to time the Customer may visit the Supplier's facilities and perform an operational audit to ensure Supplier is meeting expectations. See Exhibit H

11. **Warranties.** Supplier warrants that the Products will (i) conform, in all material respects, to the Specifications, standards, drawings, samples, descriptions, quality requirements, performance requirements, and fit, form and function requirements furnished, specified or approved by Customer for the Products; (ii) be free from defects, latent or otherwise, in design, materials and workmanship; (c) not infringe upon, violate or misappropriate the Intellectual Property Rights of any person; and (d) comply with all applicable Laws. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS SECTION, SUPPLIER, NOR ANY OTHER PERSON ON SUPPLIER'S BEHALF, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE, TRADE OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, INCLUDING ALL WARRANTIES OF MERCHANTABLITY AND FITNESS FOR A PARTICULAR PURPOSE.

12. **Termination**. Either Party may terminate this Agreement:

(a) if the other Party materially breaches or violates any of the warranties, representations, agreements, covenants, terms or conditions of this Agreement, and such breaching Party fails to remedy the breach or violation within thirty (30) days after receipt of written notice of the breach or violation from the non-breaching Party;

(b) in the event of the bankruptcy, insolvency, reorganization or liquidation of the other Party hereto.

(c) Effect of Termination. Upon the termination of this Agreement by either Party for any reason, Supplier shall immediately cease producing the Products and discontinue all use of Customer's Intellectual Property Rights. In addition: (i) Supplier promptly shall deliver to Customer all packaging, advertising or other Materials delivered by Customer to Supplier or that bear Customer's Intellectual Property Rights; (ii) each Party shall return to the other all Confidential Information (as below defined); and (iii) Customer shall reimburse Supplier for any finished inventory on hand. Termination of this Agreement shall not affect the right or obligations of either Party that have accrued prior to the effective date of the termination.

5

13. **Insurance**. Supplier shall at all times during the Term and for a period of one year thereafter, maintain a recall insurance policy in scope and amounts customary for the industry in which Supplier operates, which in no event shall have coverage limits of less than $1,000,000 per occurrence and $5,000,000 in the aggregate. Supplier shall also carry the following insurance:

| | |
|---|---|
| Commercial General Liability | $1,000,000 occurrence |
| | $2,000,000 aggregate |
| | $2,000,000 Products aggregate |
| | $1,000,000 Personal & Advertising Liability |
| Umbrella Liability | $9,000,000 excess of primary follow form |

14. **Indemnification.**

(a)  Supplier shall defend, indemnify and hold harmless Customer, its affiliates, agents, officers, directors, shareholders, employees and distributors, from and against any and all third party liabilities, claims, suits, actions, losses and expenses (including attorneys' fees and costs) based upon or arising out of (i) Supplier's breach of any warranty set forth in this Agreement or Supplier's failure to otherwise perform in accordance with the terms of this Agreement, (ii) any claim that the Products infringe on the Intellectual Property Rights of any third party (unless such claim relates solely to Specifications provided by Customer), (iii) any Recall to the extent caused by the negligence or act or omission of Supplier, or (iv) any claim to the extent caused by the gross negligence or willful misconduct of the Supplier or of any of its employees, officers, directors, shareholders or agents.

(b)  Customer shall defend, indemnify and hold harmless Supplier, its affiliates, agents, officers, directors, shareholders, employees and distributors, from and against any and all third party liabilities, claims, suits, actions, losses and expenses (including attorneys' fees and costs) based upon or arising out of (i) Customer's failure to perform in accordance with the terms of this Agreement, (ii) any claims relating to Products, and/or packaging thereof, sold by Customer, but not to the extent caused by Supplier's failure to provide Products in accordance with the Specifications, (iii) any Recall to the extent caused by the negligence or act or omission of Customer; or (iv) any claim to the extent caused by the gross negligence or willful misconduct of Customer or of any of its employees, officers, directors, shareholders or agents.

(c)  Survival. The provisions of this Section 12 shall survive the expiration or early termination of this Agreement.

15. **Waiver**. No claim or right arising out of a breach of this contract can be discharged in whole or in part by a waiver or renunciation of the claim, or right unless the waiver or renunciation is in writing signed by the aggrieved Party.

16. **Non-Disclosure and Confidentiality**. All information pertaining to the other Party's business and the existence and terms of this Agreement shall be maintained by the Parties in strict confidence and shall not be disclosed to any person or entity for any reason or used by either Party except as necessary for it to perform its obligations hereunder. The terms of this provision will survive the termination of this Agreement. The limitations contained in this Section 14 will not apply to: (a) information which is in the public domain at the time of disclosure; (b) information that becomes part of the public domain after disclosure through no fault of the other Party; (c) information that was known by

6

the other Party at the time of disclosure; (d) information which was supplied to either Party by a third party or was independently developed by the receiving Party without reference to such information or (e) information required to be disclosed by legal authority but only to the minimum extent required by law.

17.    **Assignment; Delegation**. Neither Party shall assign any right or interest in this Agreement without the written permission of the other Party, which permission will not be unreasonably withheld or delayed. Any attempted assignment or delegation in violation of the foregoing shall be wholly void and totally ineffective for all purposes unless made in conformity with this paragraph.

18.    **Choice of Law; Venue**. This Agreement and performance hereunder shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles.

19.    **Independent Contractors**. The Parties agree that Supplier shall provide the Products as an independent contractor. This Agreement shall not constitute or create a joint venture, partnership, agency relationship or employment relationship between the Parties. Neither Party shall have any authority whatsoever to create, or to assume in the name of any other Party or on its behalf, any obligations, express or implied, for any purpose.

20.    **Entire Agreement; Modification; Severability**. This Agreement states the entire agreement between Supplier and Customer with respect to the subject matter hereof. This Agreement may be modified only by a writing duly signed by both Parties. Each provision of this Agreement is severable and if any provision will be finally determined to be invalid, illegal or unenforceable (**"Invalid"**) in any jurisdiction, the remaining provisions will not be affected hereby, nor will said provision be Invalid in any other jurisdiction.

21.    **Notices.** All notices which concern this Agreement will be given in writing, as follows: (i) by actual delivery of the notice into the hands of the Party entitled to receive it, in which case such notice will be deemed given on the date of delivery; (ii) by a recognized express overnight carrier, in which case such notice will be deemed given on the date of delivery; or (iii) by electronic (e-mail) transmission, in which case such notice will be deemed given on the date it is sent, receipt confirmed. Any Party to this Agreement may change its address for notice purposes, by providing written notice in the manner set forth above of the change of address to the other Party. All notices, which concern this Agreement, will be addressed as follows:

To Customer:

Hickory Farms, LLC
311 S. Wacker Drive
Suite 2030
Chicago, IL 60606

Attn: Ray Chacon

With a copy to:

Taft Stettinius & Hollister LLP
111 East Wacker, Suite 2800
Chicago, IL 60601
Attn: Payal Keshvani, Esq.

Case 1:25-cv-00689-TDS-LPA    Document 10-1    Filed 08/27/25    Page 8 of 21

To Supplier:

South Atlantic Packaging Corporation, LLC
3928 Westpoint Blvd
Winston-Salem, NC 27103
Attn: Tamara Stafford, Controller

22.     **Dispute Resolution.** In the event of a difference, controversy or claim arising out of, relating to, or having any connection with, this Agreement, including any question regarding its negotiation, existence, validity, interpretation, performance, or breach, will first be settled through mandatory discussions and negotiations between the Parties. Such discussions and negotiations will occur via telephone, web conference, and/or in-person meeting between a managing officer of each Party.

23.     **Counterparts.** This Agreement may be executed in the original,  or by any generally accepted electronic means (including transmission of a pdf file containing an executed signature page) in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

24.     **Incorporation of Exhibits and Recitals.** The Recitals and Exhibits to this Agreement are fully incorporated into and constitute a part of the substantive provisions of this Agreement.  In the event of a conflict between the terms of this Agreement and the Exhibits, the terms of this Agreement shall govern.

25.     **Force Majeure.** Any delay or failure of either Party to perform its obligations under this Agreement will be excused to the extent that the delay or failure was caused directly by an event beyond such Party's control, without such Party's fault or negligence and that by its nature could not have been foreseen by such Party or, if it could have been foreseen, was unavoidable (which events may include natural disasters, embargoes, explosions, riots, wars or acts of terrorism) (each, a "**Force Majeure Event**"). Either Party shall give the other Party prompt written notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event and the anticipated duration of such Force Majeure Event. Such Party shall use all diligent efforts to end the Force Majeure Event, ensure that the effects of any Force Majeure Event are minimized and resume full performance under this Agreement. If any Force Majeure Event lasts more than thirty (30) days, the non-affected Party may immediately terminate this Agreement without any liability to the affected Party.

**[Signature Page Follows]**

8

IN WITNESS WHEREOF, the undersigned have executed this Contract Packaging Agreement as of the Effective Date.

CUSTOMER:

HICKORY FARMS, LLC

By: _____

Printed Name: Ray Chacon

Title: SVP of Operations

SUPPLIER:

South Atlantic Packaging

By _____

Printed Name: Julian R Bossong

Title: CEO

## EXHIBIT A

### Products

[**NTD**: To list all products to be packaged by Supplier.]

18oz Standard Popcorn Tins (100ct display pallet)

## EXHIBIT B

### Supplier's Facilities

[**NTD**: To list all facilities where Supplier will package the Products.]

South Atlantic Packaging
7745 East 42nd St
Indianapolis, IN 46226

South Atlantic Packaging
3901 W Miller Rd
Suite 100
Garland, TX 75042

**EXHIBIT C**

**Facility Qualifications**

[**NTD**: To list all of the required qualifications for Supplier's Facilities.]

SQF2 or higher for specific customers

**EXHIBIT D**

**Specifications**

[**NTD**: To list specifications (including any design specs, quantity, packaging directions, delivery timelines, etc.) of all Products.]

Bill of Materials
Customer Specific Requirements
Co-Packer Report
Material Flow
Quality Packet
Quality Images

## EXHIBIT E

### Pricing

[NTD: Parties to insert pricing per product.]

"All in" pricing for all tin designs

Standard Popcorn Tin (100ct pallet display) - $0.5512

Floor Loaded Container Unload at a prorated price structure based on the qty of cases that equate to a full pallet:

5 pallets worth of floor loaded cases = $100 per Container

10 pallets worth of floor loaded cases = $200 per Container

15 pallets worth of floor loaded cases = $300 per Container

26 pallets worth of floor loaded cases = $400 per Container

## EXHIBIT F

### Form Purchase Order

[NTD: Parties to insert form Purchase Order.]

N/A – no need for Purchase Order for co-packer

## EXHIBIT G

### Reporting Requirements and Service-Level Metrics

- **Reporting Requirements**
  - o Share Point Site or other agreed upon method specific to Customer

- Prior to the Effective Date, a Share Point site will be established by Customer. The purpose of this site will be to share documents. It will be the responsibility of the Supplier to scan and upload:
  - Inbound receiving documentation (Bill of Lading and Lot Codes)
  - Photographs of damaged items
  - Outbound Shipping Documents (more detail to be provided)
- In addition to uploads, this site will also be a place to share production reporting, quality control issues, scrap documentation, and other pertinent information that will be needed by both Customer and Supplier to complete the project.
- A link will be shared at the time of creation, to be used only by the Supplier. This link will not be shared with anyone outside of the Supplier's organization.

o <u>Daily Reporting</u>. Supplier shall be responsible to provide Customer the following daily reports **[through the Share Point Site or other agreed upon method]**.
  - All receipts of Customer Materials noting any exceptions and damages; by Purchase Order. Receipt info within 24 hours of receiving; notifying the Customer of any exceptions or damages
  - Production reports of finished goods including quantity produced for each master lot code;
  - Master lot code and batch number details including the component lot codes and quantities consumed; and traceability for recalls.
  - Completed shipments- detailed list of orders shipped, including shipment time, quantity by item and lot code.

o <u>Weekly Reporting</u>. Supplier shall be responsible to provide Customer the following **[weekly]** reports through the Share Point Site or other agreed upon method:
  - Inventory of all Customer Materials, Customer components and Finished Goods.
  - Component Consumption Reports: Component consumption reports will need to be sent to Customer's associates as provided by Customers that will detail food item lot numbers consumed.
  - Scrap/Damages of Customer Materials, which shall include:
    - Detailed counts of all discarded tins, food, and other component items will need to be maintained on a report that will be shared on the Share Point Site or other agreed upon method.

o <u>Traceability Checks & Record Maintenance  included in product specification.</u>

- Supplier Quality staff will maintain detailed logs of all food item lot number usage. This log will need to be accessible to any on-site Customer associate.
- Supplier will need to perform regular line inspections, two per hour, to ensure the following:
  - Correct Bill of Material is being utilized on the line for the item being produced
  - Lot numbers are being recorded properly on all logs
  - Master Lot Codes are printing properly on all tin items.
  - Shrink bands are sealing properly and that heat tunnel equipment is properly calibrated to ensure proper shrink.
  - Correct pallet pattern is being followed, as outlined in the item specification sheet.
  - Proper labeling of cases and pallets is being adhered to as outlined in product specification sheet.
  - Pallets are being securely wrapped with the appropriate gauge shrink wrap in accordance with the item's specification.

- **Distribution Service Levels and Metrics** – Supplier shall be responsible for meeting the following service levels and metrics: [2]
  - **Outbound shipment accuracy** – defined as shipping the correct item and correct quantity per customer order; calculated as a percentage of accurate item-quantity (e.g., if 13,000 units of Item A for an order of 13,500 units of Item A were accurately shipped, then the shipment accuracy would be 96.296% for that order)
    - Service Level to be calculated <u>weekly</u> in aggregate across all item/orders for the week
    - Target metric 100%
    - Minimum metric: 98%
    - Failure: 97%
    - **Critical Metric 97.9%**
  - **On-time availability** – defined as order complete and ready to ship/customer pick-up per the date required on the customer order

---

[2] NTD: Parties to discuss mutually agreed upon metrics and "good performance" standards.

24844415.4

- - - Service level to be calculated <u>weekly</u> in aggregate across all orders for the week (e.g., if 45 orders are scheduled to leave the Supplier's facility in one week, and 40 orders are complete on-time, then the metric on-time availability for that week would be 88.89%)
    - Target metric 100%
    - Minimum metric: 98%
    - Failure: 97%
    - **Critical Metric 97.9**
  - o **Inventory Accuracy of Customer Materials**
    - Inventory vs. Expected Inventory (Received - Consumed - Damages/Scrap) calculated <u>monthly</u>
    - Target metric 99%
    - Minimum metric: 98%
    - Failure: 97%
    - **Non-critical metric 97.9**
  - o Reporting
    - Weekly/monthly reporting as required by the defined service levels where
      - Green = performance >= Target
      - Yellow = performance at or above Minimum but below Target
      - Red = performance below Red
  - o Corrective Actions[3]
    - Supplier and Customer will meet weekly during the Production Season to review performance and identify issues and risks with respect to these service level metrics and general business execution.

- - **Outbound Shipping Schedule**
  - o Supplier will schedule all outbound shipments with Customer and its customer's carriers.
    - Customer will require visibility to all scheduled appointments on some form of Outbound Shipment Schedule.

---

[3] NTD: Parties to mutually agree upon Corrective Actions.

- - - - - - Customer requests that a Customer associate be copied on all shipment appointment emails.

- **Finished Goods Preparation for Shipment**
  - o Supplier will ensure that all finished good cases and pallets are properly labeled for shipment per Customer and its customer's specifications.
  - o All pallets require placard to be placed on one side of the pallet.
  - o All pallets should be inspected prior to shipment to check for:
    - Damage to finished goods;
    - Damage to wood pallets;
    - Proper stretch-wrapping; and
    - Stretch-wrap must cover at least 1 inch of the wood pallet.
  - o At the time of shipment Supplier will take two photographs to be uploaded with paperwork to the Share Point Site for that shipment:
    - A photo of the loaded trailer showing the placement of the airbag; and
    - A close up of a pallet placard showing the proper P.O., customer, ship-to location, etc.

- **Blu Jay Logistics**
  - o Customer will route all of its customer's shipments through Blu Jay Logistics TMS and may require Supplier to update certain orders in Blu Jay to ensure timely pick-up and delivery.
  - o Coordination with Customer's transportation team will be required on a daily basis. Key contacts and email addresses will be communicated to the appropriate Supplier personnel.

- **Shipping/Paperwork**
  - o Supplier agrees to load all scheduled trucks that arrive on time within 2 hours from the time driver checks-in. Failing to do so will result in Supplier paying for any detention charges that may accrue as a result.
  - o A Customer associate will upload Bills of Lading and Manifests for all customer orders onto Share Point or other agreed upon method. Supplier staff will be able to download and print this paperwork as needed.
  - o Supplier must provide a signed Bill of Lading and Manifest that is also time-stamped with the driver's check-in time and check-out time.

24844415.4

- o A supplement to the BOL and Manifest will be provided by the Supplier detailing the quantities on each shipment by Master Lot Code.
- o All shipping paperwork (Signed BOL, Manifest & Lot Code Supplement) will need to be scanned and uploaded onto the Share Point Site or other agreed upon method within one business day of shipment.
- o Priority will be for all Customer Customers that require Advanced Ship Notices (ASN). This paperwork will need to be uploaded within 12 hours of shipment. The specifics about which customers require ASN will be provided by Customer Transportation Staff.

**EXHIBIT H**

**Audit Form**

24844415.4

- [NTD: Parties to insert form Audit Form.]

**Co-Packer Performance Audit**

| | |
|---|---|
| Co-Packer Name: | |
| Location: | |
| Auditor's Name: | |
| Date of Evaluation: | |

**Ratings:**
5 = Exceeds Standards
4 = Meets Standards
3 = Average Performing (is fit position / still not due to training?)
2 = Below Average Needs Training/Refresher on Expectations
1 = No Skill or Knowledge in the Area